UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| DARRYL D. AGLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:14-CV-099 JD |
| | ) | |
| WESTHEIMER CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This is a trademark infringement action over two marks associated with Stratotone guitars, which were originally sold by the Harmony Guitar Company beginning in 1953. That company ceased its sale of those guitars and its use of the marks in the 1960s, and neither of the parties in this case attempt to trace their claim to the marks back to that original use. Rather, they each claim that they appropriated the marks for themselves through their own more recent sales of Stratotone guitars that they produced on their own—Westheimer Corporation, through a predecessor's short-lived sales of the guitars around 2001, and Darryl Agler, through his own sales beginning around 2008. Currently, both parties are selling Stratotone guitars bearing the marks in question. Because the marks and the products on which they are used are identical, or nearly so, there is no dispute that one party is infringing on the other's rights; the sole question is which. Mr. Agler moved for summary judgment in his favor, contending that Westheimer's predecessor either never had rights in the marks or that it abandoned them, such that the marks were back in the public domain by the time Mr. Agler began using them. Westheimer argues that genuine factual disputes preclude summary judgment on those questions. For the following reasons, the Court grants the motion in part and denies it in part.

# I. FACTUAL BACKGROUND

In 1953, the Harmony Guitar Company, one of the country's major producers of guitars, began selling a line of guitars known as Stratotones. That name appeared on the head of the guitars, and below that appeared a logo resembling an atom with a music note in the middle (the Atom mark). Those two marks, as they appear on Mr. Agler's recreations of the guitars, are shown in this picture:



The Harmony Guitar Company ceased its sale of those guitars in the mid-1960s, and it went out of business in the mid-1970s.

In 2000 or 2001, a company named M.B.T. International acquired a license to market reissues of instruments originally sold by the Harmony Guitar Company, including the Stratotone. Thomas Malm was the Vice-President and General Manager of the Harmony product line at MBT at the time. He testified that MBT was in "the very early stages of a slow ramp up" of sales, but that Harmony guitars including Stratotones were being shipped to retailers and were being sold to the public. [DE 41-3 p. 43]. There is some dispute as to who licensed those products to MBT, though. Mr. Malm testified that MBT licensed the products from a company

that belonged to Charles Subecz, who was the president of Harmony Industries, Inc.—an entity distinct from the Harmony Guitar Company. Other evidence indicates that MBT's license was from a company named Global Musical Instrument Company, Inc., which had purchased certain assets from the Harmony Guitar Company when it went out of business.

In either event, MBT's sales of the guitars were rather short-lived, as it terminated its license and ceased its sales at some point in 2001, or possibly 2002. After MBT terminated its license, Mr. Subecz and Mr. Malm, who left MBT in July 2001, began working together to bring the guitars back to the market on their own. They developed samples of the guitars and worked with manufacturers on producing them, and were nearly ready to begin selling the guitars. At that point, however, MBT sent a cease and desist letter and threatened suit, claiming that it owned certain artwork associated with the guitars. Mr. Subecz had previously spoken to Mr. Malm about his experience being involved in a lawsuit over a brand, and said that "if anything like that ever happens again, he's pulling the plug and he's not going to be involved." [DE 41-3 p. 35]. Consistent with those remarks, Mr. Subecz dropped the project as soon as MBT threatened suit, and he and Mr. Malm parted ways in 2002.

Several years later, Darryl Agler, the plaintiff in this action, became interested in producing reissues of Stratotone guitars on his own. On March 7, 2006, he filed an application with the United States Patent and Trademark Office to register "Stratotone" as a trademark based on his intent to use the mark. He has not, nor has any other party, applied to register the Atom mark, though. Mr. Agler then began custom-building and selling several Stratotone guitars a year, though there is some question as to when those sales commenced. After he successfully defended his trademark application against an objection, the Stratotone mark became registered to Mr. Agler on the Principal Register of the Patent and Trademark Office on June 28, 2011.

3

In the meantime, Harmony Industries resumed activity relative to the Stratotone brand. On March 13, 2007, Harmony Industries filed an intent-to-use application to register the Stratotone mark, but that application was denied based on Mr. Agler's earlier-filed application. In addition, in January 2008, Harmony Industries announced its own release of Stratotone guitars, and it displayed them at an industry trade show. Then, in February 2009, Westheimer Corporation, the defendant in this action, purchased all of Harmony Industries' assets and good will, which would include any interest it may have had in any protectable marks. Westheimer then began production of Stratotone guitars on its own behalf and began selling the guitars in 2009.

In light of these competing uses of the same marks on the same products, Mr. Agler initiated this action on March 27, 2014. He filed an eight-count complaint against Westheimer, asserting both state and federal claims arising out of Westheimer's use of the Stratotone mark (but not the Atom mark), including claims for unfair competition, trademark infringement, and trademark counterfeiting, among others. Westheimer responded by asserting counterclaims against Mr. Agler, alleging that he was infringing on its rights in both the Stratotone and Atom marks. Westheimer also sought cancellation of Mr. Agler's registration of the Stratotone mark. Discovery has now closed, and Mr. Agler has filed a motion for summary judgment.

## II. STANDARD OF REVIEW

On summary judgment, the moving party bears the burden of demonstrating that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Where a factual record

taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008); *King v. Preferred Tech. Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). However, the non-moving party cannot simply rest on the allegations or denials contained in its pleadings, but must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).

### III.  DISCUSSION

Mr. Agler has moved for summary judgment on Counts I through IV of his complaint, which assert claims under the Lanham Act for unfair competition and false designation of origin, trademark infringement, and trademark counterfeiting, and a claim under common law for unfair competition and trademark infringement, all of which relate to the Stratotone mark only. Mr. Agler also moves for summary judgment on all of Westheimer's counterclaims, which include reciprocal claims against him as to both the Stratotone and Atom marks, plus a claim to cancel his registration of the Stratotone mark. In his motion, Mr. Agler does not differentiate among the various claims, but asserts that he can prevail on each of his own claims at issue by establishing that he owns a protectable mark and that Westheimer's use of the mark is likely to cause confusion. He further asserts that Westheimer's counterclaims each fail because Mr. Agler has priority to each of the marks. Westheimer does not challenge those premises, nor does it dispute

5

that the marks are protectable or that competing uses of the marks are likely to cause confusion. Accordingly, the sole question is whether Mr. Agler or Westheimer has priority to the marks in question. Because the facts differ in a critical way between the Stratotone mark and the Atom mark, the Court considers each in turn.

**A.        The Stratotone Mark**

Both parties claim ownership of the Stratotone mark. Where two parties each assert rights in the same mark, "[t]he party who first appropriates the mark through use . . . acquires superior rights to it." *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 434 (7th Cir. 1999); *see also United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 100 (1918) ("[T]he general rule is that, as between conflicting claimants to the right to use the same mark, priority of appropriation determines the question."). As particularly applicable here, though, if an owner of a mark abandons it, the mark "returns to the public domain, and may be appropriated anew." *Specht v. Google Inc.*, 747 F.3d 929, 935 (7th Cir. 2014); *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 954–55 (7th Cir. 1992) ("Because trademark rights derive from the use of a mark in commerce . . . , the owner of a mark will lose his exclusive rights if he fails to actually use it."). The Court must therefore consider when each party began using the mark and whether the mark was subsequently abandoned.

Beginning with Mr. Agler's priority date, it is undisputed that Mr. Agler filed an "intent-to-use" application to register the Stratotone mark on March 7, 2006.[1] Pursuant to 15 U.S.C. § 1057(c):

> Contingent on the registration of a mark on the principal register provided by this chapter, the filing of the application to register such mark shall constitute

---

[1] Mr. Agler's reply brief appears to have transposed the numbers in the date, as it consistently references "March 6, 2007." The exhibits show that Mr. Agler's intent-to-use application was submitted March 7, 2006, though, and since Mr. Agler's opening brief (upon which Westheimer based its response) was accurate, the Court accepts March 7, 2006 as Mr. Agler's priority date.

6

> constructive use of the mark, conferring a right of priority . . . against any other person except for a person whose mark has not been abandoned and who, prior to such filing--
>
> **(1)** has used the mark;
>
> **(2)** has filed an application to register the mark which is pending or has resulted in registration of the mark; or
>
> **(3)** has filed a foreign application to register the mark on the basis of which he or she has acquired a right of priority, and timely files an application under section 1126(d) of this title to register the mark which is pending or has resulted in registration of the mark.

15 U.S.C. § 1057. The Stratotone mark became registered on the principal register on June 28, 2011, and no other party had filed an application to register the mark as of the date of Mr. Agler's application. Accordingly, Mr. Agler has a right of priority against any other party except for one that had used the Stratotone mark prior to March 7, 2006 and who had not abandoned it.

As to Westheimer's priority date, Westheimer does not claim to have used the Stratotone mark itself until well after 2006. However, it is undisputed that around 2001, Stratotone guitars were sold under a license by a third party, MBT, meaning that rights to the mark accrued at that time to the licensor.[2] In addition, Westheimer purchased any rights that Harmony Industries had in the Stratotone mark in 2009. Therefore, for Westheimer to have priority over Mr. Agler to the Stratotone mark, Harmony Industries must have been the licensor of the MBT sales, and Harmony Industries must not have thereafter abandoned the mark. If those two facts are true, then Harmony Industries would have had priority over Mr. Agler due to its previous use of the mark, and Westheimer would have acquired that priority through its later purchase of Harmony Industries' assets.

---

[2] Mr. Agler's opening brief denies that any rights to the mark inured to the licensor through MBT's sales, but he conceded otherwise in his reply brief.

On the first question, the Court finds a genuine factual dispute as to whether the sales by MBT were under a license from Harmony Industries. Substantial evidence, including testimony from Westheimer's own representative and its own written discovery responses, indicates that MBT actually licensed the mark from Global, not from Harmony Industries. Since Westheimer declined to pursue any argument that Harmony Industries purchased the rights to the mark from Global, [DE 40 p. 10], that would mean that Harmony Industries never acquired any interest in the Stratotone mark. However, there is other evidence in the record suggesting that Harmony Industries was the licensor. Thomas Malm, who worked at MBT into 2001, testified that MBT's license was with Charles Subecz's company. [DE 41-3 p. 22, 33, 47]. While Mr. Malm could not recall the name of that company, other documents refer to Mr. Subecz as the president of Harmony Industries. [DE 38-10 p. 4; 38-15 p. 7; *see also* 41-3 p. 39]. A jury could therefore find that Harmony Industries licensed the Stratotone mark to MBT, and thus acquired rights in the mark at that time, which precludes summary judgment on that basis.

Therefore, to receive summary judgment in his favor, Mr. Agler must show that Harmony Industries abandoned the Stratotone mark. "A trademark is abandoned if its 'use in commerce' has been discontinued with no intent to resume its use." *Specht*, 747 F.3d at 934; 15 U.S.C. § 1127. The party asserting abandonment—here, Mr. Agler—bears the burden of establishing both non-use and intent not to resume use. *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 147 (2d Cir. 2007); *Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 639 (7th Cir. 2003); *Vision Ctr. Nw., Inc. v. Vision Value, LLC*, 673 F. Supp. 2d 679, 686 (N.D. Ind. 2009). "Intent not to resume may be inferred from the circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment." 15 U.S.C. § 1127. Once a presumption of abandonment has been triggered by three years of non-use, a party may rebut that presumption "with evidence excusing the nonuse

or demonstrating an intent to resume use." *Specht*, 747 F.3d at 934; *Zelinski*, 335 F.3d at 639. "But the intent to resume use in commerce must be formulated within the three years of nonuse." *Specht*, 747 F.3d at 934.

Here, the evidence shows that actual sales of the Stratotone guitars ceased when MBT terminated its license, though there is some uncertainty as to when that occurred. Mr. Malm testified that he left MBT around July 2001, and that MBT did not continue selling the guitars for "very long at all, if at all," after he left. [DE 41-3 p. 37, 39]. Westheimer also submitted advertisements for the guitars that MBT placed in Guitar Player magazine, the last of which appeared in the August 2001 issue. [DE 40-7]. The precise date is unimportant, though, as at least initially after MBT ceased its sales, there was an intent to resume use. Mr. Malm testified that he and Mr. Subecz planned on bringing Stratotone guitars back to the market once MBT terminated its license. [DE 41-3 p. 24–25, 34–36, 45–46]. They put together a plan to continue the sales that MBT had begun, and got as far as working with manufacturers and producing samples. [DE 41-3 p. 36]. Mr. Malm testified that "without a doubt," he and Mr. Subecz planned on bringing the Stratotone back at that point, which was in 2002. [DE 41-3 p. 36; *see also* DE 40-6 (in an article dated November 1, 2002, announcing plans by a "new company," presumably referring to Harmony Industries, to produce Stratotone guitars)]. It is also fair to infer that Mr. Subecz was acting on behalf of Harmony Industries, which was his company and which owned the mark, such that those plans are attributable to Harmony Industries to show its intent to resume use of the mark.

Before that happened, though, MBT threatened suit over some of the artwork associated with the guitars, which brought an end to their plans. As Mr. Malm testified:

> A. I haven't had a conversation with Charlie [Subecz] since we parted companies in 2002.

9

> Q. And if we talk about that, in 2002 it sounded to me like you and Charlie were going to take the Stratotone brand and the entire Harmony line and start your own company?
>
> A. . . . . [Y]es, that was what our intention was.
>
> Q. And what happened to that intention?
>
> A. MBT decided that they were going to -- they -- their attorneys sent him a cease and desist letter. And he ceased and desisted because he didn't want to go through another ugly court battle with anybody.
>
> Q. So that ended your partnership?
>
> A. That ended our partnership. And it happened -- all the same day it happened was the day that samples arrived from Korea for us to take a look at to see if they were what we needed to go to market with.

[DE 41-3 p. 45–46]. Mr. Malm further explained by way of background:

> . . . Charlie, when we got in the agreement in the very first -- the first day, the very first meeting we had with Charlie; before we ever signed any papers and everything else, he had talked about his experiences in a lawsuit before over the brand, that he eventually won, that wore him out. And he said if anything like that ever happens again, he's pulling the plug and he's not going to be involved.
>
> And pretty much once MBT decided that they were going to take some action, for whatever reason, it probably wouldn't have any grounds to win on it, but as soon as they said they were going to take some action I didn't hear from Charlie anymore.

[]DE 41-3 p. 34–35].

After that point, the record falls silent as to any use of or intent to use the Stratotone mark by Harmony Industries until March 13, 2007. On that date, Harmony Industries filed an intent-to-use application to register the Stratotone mark. [DE 38-11]. There is absolutely no evidence about what occurred during the interim, as the record contains no testimony from Mr. Subecz or any sort of evidence from Harmony Industries about that period. Thus, given Mr. Malm's testimony that his and Mr. Subecz's (and thus Harmony Industries') plan to bring the Stratotones back ceased in 2002, there is a period without any use or any evidence of intent to use from at least January 1, 2003 through March 13, 2007—a period of over four years. In addition, though

10

Harmony Industries' application may show an intent to use the mark at that point, the first evidence of any actual use of the mark in commerce occurred in January 2008 when Harmony Industries displayed Stratotone guitars at an industry trade show, at least five years after dropping the earlier project.

That period of non-use triggers a presumption of abandonment. *Specht*, 747 F.3d at 934; 15 U.S.C. § 1127. To rebut that presumption, Westheimer must produce evidence "excusing the nonuse or demonstrating an intent to resume use." *Specht*, 747 F.3d at 934. Westheimer has produced no such evidence here. As just noted, there is no evidence for an over-four-year period as to Harmony Industries' use of or intent to use the Stratotone mark, and an even longer period without any use. The intent-to-use application that Harmony Industries filed on March 17, 2007 suggests that at some point, it formulated an intent to resume use of the mark. But recall that "the intent to resume use in commerce must be formulated within the three years of nonuse." *Specht*, 747 F.3d at 934; *see also Punchgini, Inc.*, 482 F.3d at 149 n.9 ("An intent to resume use of the mark formulated after more than three years of non-use cannot be invoked to dislodge the rights of another party who has commenced use of the mark—thereby acquiring priority right in that mark—after three years of non-use."). It would require pure speculation to say that the March 17, 2007 application shows that Harmony Industries developed that intent by January 1, 2006, over a year earlier. Likewise, Westheimer's assertion that Harmony Industries always intended to resume its use of the mark, despite the period of non-use, is insufficient to rebut the presumption of abandonment, and is unsupported by the evidence. *See Zelinski*, 335 F.3d at 639 (holding that a trademark owner's "mere statement that he didn't abandon his mark is insufficient" to rebut a presumption of abandonment).

Finally, Westheimer argues that Harmony Industries intended to resume its use of the Stratotone mark after the sales by MBT, but that its "[p]lans were delayed when a dispute occurred with MBT over the ownership of the advertising artwork." [DE 40 p. 13]. Though risk-avoidance during litigation could possibly explain a period of non-use, *Zelinski*, 335 F.3d at 639, Westheimer has not shown that that was the case here. First, Mr. Malm's testimony was not that Mr. Subecz wanted to wait out any litigation to mitigate his exposure, as in *Zelinski*. Rather, Mr. Malm testified that Mr. Subecz had no intention of being involved in a project that was the subject of litigation, and that he walked away from the Stratotone project as soon as that prospect emerged. [DE 41-3 p. 34–35, 45–46]. Thus, far from explaining a period of non-use so as to avoid abandonment, this testimony indicates that Mr. Subecz and Harmony Industries expressly intended to—and did—abandon the project at that time. There is also no evidence of any steps that Harmony Industries took after that point to use the mark in ways that would not be subject to the dispute or to prepare to resume use of the mark once any dispute concluded, further distinguishing these facts from *Zelinski*. Moreover, there is no information in the record as to how or when any dispute between MBT and Harmony Industries was resolved or, in particular, why a dispute that related only to advertising artwork, not the mark or the products themselves, would cause over five years of non-use. *Yellowbook Inc. v. Brandeberry*, 708 F.3d 837, 848 (6th Cir. 2013) (rejecting pending litigation as an excuse for six years of non-use because "there is only sparse evidence about the lawsuit in the record, and the district court should not deny summary judgment on such speculative grounds"). Accordingly, this reason does not explain the period of non-use, either.

The Court therefore finds that there is no genuine dispute that Harmony Industries abandoned any interest it may have had in the Stratotone mark by the time Mr. Agler filed his

application on March 7, 2006. Since Harmony Industries' abandonment of the mark returned it to the public domain, Mr. Agler's intent-to-use application gave him priority to the mark, and gave him rights superior to any that Westheimer or Harmony Industries may have acquired through their own later uses of the mark. *Specht*, 747 F.3d at 935. Because Westheimer's entire defense to the motion for summary judgment is predicated on the existence of a dispute as to which party has senior rights in the mark, the Court grants Mr. Agler's motion as to each of the claims and counterclaims in question insofar as they relate to the Stratotone mark.

**B.     The Atom Mark**

Both parties also claim ownership of the Atom mark, which is the subject of certain of Westheimer's counterclaims. However, unlike the Stratotone mark, neither party has filed an application to register the Atom mark. Accordingly, their priority must be based on the dates they began actually using the mark in commerce. *Johnny Blastoff*, 188 F.3d at 434 ("The party who first appropriates the mark through use, and for whom the mark serves as a designation of source, acquires superior rights to it."). "A party may acquire a protectable right in a trademark only through use of the mark in connection with its product." *Id.* at 433. "The party seeking to establish appropriation of a trademark must show first, adoption, and second, 'use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of [the adopter of the mark].'" *Id.* at 433–34 (quoting *New W. Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1200 (9th Cir. 1979) (alteration in original)). "Evidence of actual sales is not necessary to establish ownership." *Id.* at 434.

Here, the evidence shows that Harmony Industries began using the Atom mark as early as January 2008, when it displayed its Stratotone guitars (presumably bearing the Atom mark) at an industry trade show. [DE 40-9 p. 2, 9; DE 38-7 p. 9]. Harmony Industries' website at the time also announced its release of the guitars, and invited dealers to contact it through the website or

13

to visit it at the trade show for more information. [DE 40-9 p. 9]. Thus, at least for summary judgment purposes, Westheimer's priority date in the Atom mark is January 2008. As to Mr. Agler's priority date, Mr. Agler submitted four handwritten receipts he wrote for sales of Stratotone guitars, the first of which is dated in 2007. However, Mr. Agler also testified that he sold his first Stratotone in 2008—not 2007—and he did not specify when in 2008 that occurred. [DE 40-3 p. 5; DE 40-2 p. 6]. Moreover, the Statement of Use that Mr. Agler submitted for his registration of the Stratotone mark (the specimen for which also contains the Atom mark) declares that the Stratotone mark was "first used in commerce at least as early as 01/00/2010." [DE 40-10]. Though that is not necessarily inconsistent with the mark having been first used in 2007 or 2008, Mr. Agler has provided no explanation for why he would not have provided those earlier dates if he had actually used the mark in 2007 or 2008. Therefore, because the evidence does not unequivocally show that Mr. Agler used the Atom mark prior to January 2008, when Harmony Industries (and thus Westheimer) acquired its priority, the Court must deny Mr. Agler's motion for summary judgment as to the Atom mark.

## IV. CONCLUSION

Mr. Agler's motion for summary judgment [DE 36] is GRANTED in part and DENIED in part. The motion is granted in favor of Mr. Agler as to Counts I through IV of Mr. Agler's complaint, and as to each of Westheimer's counterclaims insofar as they relate to the Stratotone mark. The motion is denied as to Counts I through III of the counterclaims insofar as they relate to the Atom mark.

SO ORDERED.

ENTERED: October 28, 2015

/s/ JON E. DEGUILIO
Judge
United States District Court